IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAMANTHA BISER, | |
| Plaintiff, | 2:21-CV-01269-CCW |
| v. | |
| SLIPPERY ROCK UNIVERSITY, | |
| Defendant. | |

**OPINION**

Before the Court is Defendant Slippery Rock University's Motion for Summary Judgment. ECF No. 30. For the reasons that follow, the Motion will be GRANTED.

**I.    Background**

    **A.    Procedural History**

Plaintiff Samantha Biser is a former graduate student in Slippery Rock's Physician Assistant program. Her operative Amended Complaint brings two claims for damages against Slippery Rock pursuant to 42 U.S.C. § 1983, for violations of her Fourteenth Amendment rights in connection with her dismissal from the program. Count I asserts a violation of her procedural due process rights and Count II asserts an equal protection violation under a "class-of-one" theory.[1] *See generally* ECF No. 9. Slippery Rock's Motion is fully briefed and ripe for adjudication. *See* ECF Nos. 30–34, 37–40.

---

[1] This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as both claims arise under 42 U.S.C. § 1983 (Counts I & II).

B.     **Material Facts**

The following facts are drawn from the parties' Concise Statements of Material Facts, ECF Nos. 32 & 39, and are undisputed unless noted otherwise.

Ms. Biser was enrolled as a graduate student in the Master of Science Physician Assistant Studies Graduate Program at Slippery Rock.  ECF No. 32 ¶ 1.  All physician assistant graduate students were given a copy of the PA Program Student Handbook that outlined the graduate program's policies and procedures.  *See generally* ECF No. 33-1.  The Student Handbook listed the grounds that could result in a student's dismissal from the program, including "[b]eing dismissed from [a] clinical site based upon inappropriate behavior or unprofessional conduct."  *Id.* at 29.  Before beginning her studies, Ms. Biser signed a form acknowledging that she had received and read the Student Handbook.  ECF No. 32 ¶ 3.

At Slippery Rock, all physician assistant graduate students had to complete ten clinical rotations to graduate.  ECF No. 33-18 at 8:10–17.  On February 22, 2020, Ms. Biser began a psychiatry rotation at the Family Center for Recovery, officially known as Wellington Retreat, Inc. ("Wellington Retreat") in Florida.  ECF No. 32 ¶ 4;  ECF No. 39 ¶ 53.  Wellington Retreat primarily provided treatment to those suffering from acute psychiatric illnesses.  ECF No. 34-1 at 12:14–17.  During his deposition, Dr. Robert Moran, the CEO and Director of Wellington Retreat, described the patients at Wellington Retreat as "the sickest of the sick," including adolescent patients.  *Id.* at 12:15–16, 13:10–11.

For this rotation, Ms. Biser secured on-site housing that Wellington Retreat offered to its visiting graduate students.  ECF No. 32 ¶ 5.  Ms. Biser shared a room with Emily Rinehimer, a fellow physician assistant graduate student at Slippery Rock.  *Id.*;  ECF No. 33-19 at 7:17–22.  Their room was located on the same floor as the patients' rooms.  ECF No. 32 ¶ 12.  The facility was secured and required a physical key to access.  ECF No. 33-18 at 17:14–22.

Wellington Retreat had guidelines for students staying on-site and prohibited students from "arriv[ing] on-site under the influence of alcohol" and stated that "[v]iolating this policy will result in immediate expulsion from the educational program." ECF No. 33-5 ¶ 16. At his deposition, Dr. Moran also testified that students were prohibited from having guests. ECF No. 39 ¶ 8.

The parties agree that upon arriving at Wellington Retreat, Ms. Biser was given a tour of the facility. ECF No. 32 ¶¶ 9–10. Dr. Moran testified at his deposition that, on the first day, students are typically given an overview of the programs and its rules. ECF No. 34-1 at 12:11–13. The parties dispute whether Ms. Biser was informed that guests were not permitted. ECF No. 39 ¶¶ 11, 55. Ms. Biser, however, acknowledges that she knew Wellington Retreat was "strict" and that other students had been dismissed from the program in the past. ECF No. 32 ¶ 15.

On February 29, 2020, Ms. Biser and Ms. Rinehimer went to a nearby restaurant for dinner and drinks. *Id.* ¶ 16. Both students drank alcohol during dinner. *Id.* While at the restaurant, the pair met a young man on vacation, whom neither knew beforehand. *Id.* ¶ 17; ECF No. 39 ¶¶ 58–59. The parties dispute whether, over the course of the night, Ms. Biser developed a relationship with the man. ECF No. 32 ¶ 19.

Around 2:30 a.m., Ms. Rinehimer called an Uber to return to Wellington Retreat. *Id.* ¶¶ 20–21. The man accompanied Ms. Biser and Ms. Rinehimer back to Wellington Retreat, but the parties dispute who made the decision for him to join them. ECF No. 39 ¶ 59. Ms. Rinehimer claims that she was not aware that the man would return with them until after the Uber arrived. ECF No. 32 ¶¶ 21–22. Ms. Biser, on the other hand, maintains that it was a group decision for him to join them. ECF No. 39 ¶ 23.

All three spent the night at Wellington Retreat in Ms. Biser's and Ms. Rinehimer's room. ECF No. 32 ¶ 24. In the morning, on March 1, 2020, Ms. Biser escorted the man from the facility.

3

*Id.* ¶ 25.  Afterwards, the roommates agreed that going forward they would not have any more guests, given Wellington Retreat's strict reputation.  *Id.* ¶¶ 15, 26.  Ms. Rinehimer later stated in her deposition that having the man in their room made her "a little bit nervous" because she did not want to do anything "to jeopardize [their] rotation."  ECF No. 39 ¶ 26;  ECF No. 33-19 at 33:10–20.

On March 2, 2020, Ms. Biser and Ms. Rinehimer were asked to meet with Dr. Moran.  ECF No. 32 ¶ 27.  Dr. Moran informed them both that a housekeeper had seen Ms. Biser escort a man from the facility.  *Id.* ¶ 27.  Dr. Moran immediately dismissed them from the rotation.  ECF No. 39 ¶¶ 27–29.  He later testified that this was "the most egregious infraction" that he has encountered during his time as director.  ECF No. 34-1 at 42:8–9.

After the meeting with Dr. Moran, Ms. Biser and Ms. Rinehimer called Professor Olivia Buterbaugh, Ms. Biser's faculty advisor at Slippery Rock, and informed her that they had been dismissed from their rotation for having an overnight guest at Wellington Retreat.  ECF No. 32 ¶¶ 31–32.  At her deposition, Professor Buterbaugh later described this phone conversation as "very shocking."  ECF No. 34-2 at 9:6–10.  She then called the Director of the Physician Assistant Studies Graduate Program, Megan Borger, to discuss the circumstances surrounding Ms. Biser's and Ms. Rinehimer's dismissal.  ECF No. 32 ¶ 34.

Later that day, on March 2, 2020, Ms. Biser and Ms. Rinehimer received an email from Ms. Borger, informing them that Slippery Rock had scheduled a disciplinary committee meeting on March 4, 2020, to address their dismissal from the rotation.  *Id.* ¶ 36;  *see generally* ECF No. 33-9.  Ms. Borger advised them that they were each permitted to select an advocate to support them during this process.  ECF No. 33-9.  Her email stated, "[T]he advocate role is to ensure that you understand what is being discussed and have the opportunity to ask any questions."  *Id.*  In

4

addition, she described that the purpose of this first meeting was "to strictly obtain information regarding the alleged incident that occurred," and that Slippery Rock would select faculty members to comprise the disciplinary committee only after the students had selected their advocates. *Id.* The pair then drove back to Pennsylvania, arriving on March 3, 2020. ECF No. 39 ¶ 40.

Ms. Biser selected Professor Audra Kessler as her advocate and, prior to the March 4th meeting, emailed her questions about the process, which Professor Kessler answered. ECF No. 32 ¶ 39; ECF No. 34-4 at 10:6–11:1.

Ms. Biser and Ms. Rinehimer had separate disciplinary committee meetings on March 4, 2020. ECF Nos. 33-11, 33-12. During Ms. Biser's meeting, Professor Kessler testified that her role as Ms. Biser's advocate included being present at all of the proceedings to ensure that each meeting was fair, that the disciplinary committee asked appropriate questions, and that Ms. Biser had an opportunity to speak during the meeting. ECF No. 32 ¶ 41. That said, Ms. Biser now disputes the zealousness of Professor Kessler's advocacy, saying that Professor Kessler never spoke on her behalf during the disciplinary process. ECF No. 39 ¶ 76–77.

At the start of Ms. Biser's March 4th hearing, Professor Buterbaugh read aloud a prepared a written statement describing the circumstances surrounding the students' dismissal. ECF No. 34-3 at 19:23–20:2. The disciplinary committee also reviewed letters sent by members of Wellington Retreat, including Dr. Moran, explaining what happened and why the two students were dismissed. *Id.* at 20:21–21:3; ECF No. 33-6. In his letter, Dr. Moran wrote that he did not trust the students' judgment, he felt that they had disrespected the facility, and he believed that they had "put themselves, patients, staff and other students in danger by allowing a complete stranger into the facility who could have been armed." ECF No. 33-6.

Ms. Biser testified before the disciplinary committee during the March 4th meeting. ECF No. 33-11. She largely confirmed that she had brought a man back to Wellington Retreat but said that "it was mutual that he was in the room." ECF No. 33-6. According to Ms. Biser, she asked for the opportunity to have counsel, which the committee denied, and she also requested that the committee decelerate her, which would temporarily suspend her from the program, rather than dismiss her. ECF No. 39 ¶ 75; ECF No. 33-1 at 28. The disciplinary committee concluded the meeting by reviewing the graduate program's manual. ECF No. 33-11.

During Ms. Rinehimer's March 4th meeting with the disciplinary committee, Ms. Rinehimer testified before the disciplinary committee that Ms. Biser had formed a relationship with the man throughout the night and that, at one point, she found them kissing at the bar when she returned from the restroom. ECF No. 33-12. Ms. Rinehimer told the disciplinary committee that "[s]he questioned [Ms. Biser] if the gentleman was coming with them," and Ms. Biser responded that "yes he was coming with [them]," but Ms. Rinehimer "was unsure what [Ms. Biser's] plan was." *Id.* She also stated at the disciplinary hearing that she was aware that they were not permitted to have guests. *Id.*

On March 6, 2020, the two students were notified that a second disciplinary committee meeting was scheduled on March 18, 2020. ECF No. 32 ¶ 45. At this second meeting, Ms. Biser again had an opportunity to speak and provide any additional documents for the committee to consider. *Id.* ¶ 46. The disciplinary committee notes, however, indicate that "[t]here was no new information provided." ECF No. 33-15.

On March 20, 2020, the students were advised that a third disciplinary committee meeting would occur on March 23, 2020. ECF No. 32 ¶ 47; ECF No. 33-16. During this third meeting, Ms. Biser again had an opportunity to speak. ECF No. 32 ¶ 48. After this meeting, the disciplinary

committee ultimately recommended that Ms. Biser be dismissed from the graduate program. ECF No. 33-15.

The disciplinary committee found that dismissal of Ms. Biser was warranted because (i) she had violated Wellington Retreat's policy that students could not arrive on-site under the influence of alcohol, which would result in an immediate expulsion from the rotation; (ii) she violated Slippery Rock's Student Handbook that said arriving under the influence of alcohol would be grounds for dismissal; (iii) she did not complete her course requirements as a result of her dismissal from Wellington Retreat; (iv) she failed to comply with the site's security protocols by bringing an unauthorized man back to the facility; (v) she violated Wellington Retreat's Professional Code of Ethics and Standards by placing patients and any confidential information related to their care at risk; and (vi) she did not comply with the Security Agreement Form at Wellington Retreat. ECF No. 33-15. This recommendation was then sent to the Program Director, Ms. Borger, who adopted it. ECF No. 34-3 at 14:9–16; ECF No. 33-17.

Ms. Borger then sent Ms. Biser a letter informing her that she had been dismissed from the Physician Assistant Studies Graduate Program. ECF No. 33-17. The letter stated that the decision was made as a result of the disciplinary proceedings and explained that she was dismissed because, according to the Student Handbook, "a student who is dismissed from a clinical site based upon inappropriate behavior or unprofessional conduct is subject [to] program dismissal." *Id.*

The parties dispute whether Ms. Biser had an opportunity to appeal the decision. ECF No. 39 ¶ 49. Some faculty testified during their depositions that the disciplinary process includes a right to appeal. *See* ECF No. 32 ¶ 49. However, the Director of the Program, Ms. Borger, clarified at her deposition that there was no appellate process at the time, at least at the program level. ECF No. 39 ¶ 49; ECF No. 34-3 at 18:9–15.

At some point, Ms. Rinehimer reapplied to the graduate program and was readmitted. ECF No. 32 ¶ 50. The parties dispute the reason Ms. Rinehimer was allowed back. According to Slippery Rock, Ms. Rinehimer was readmitted because she was seen as less culpable than Ms. Biser. *Id.* The school concluded that Ms. Biser was the one who formed a relationship with the man and brought him back as her guest. *Id.* Ms. Biser disputes this characterization and has always maintained that it was a group decision for the man to accompany them to Wellington Retreat. ECF No. 39 ¶ 51.

**II.     Standard of Review**

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (alteration omitted) (quoting *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with the moving party regardless of which party would have the burden of persuasion at trial." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal quotation marks omitted). Furthermore, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's

evidence is insufficient to carry that burden.'" *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 586–87 (internal quotation marks omitted). Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings" and point to "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal quotation marks omitted). Instead, "there must be evidence on which the jury could reasonably find for the non-movant." *Id.* (cleaned up).

### III. Discussion

Slippery Rock seeks summary judgment on both counts. With respect to Count I, Slippery Rock argues that it did not violate Ms. Biser's procedural due process rights because it provided a disciplinary process with extensive procedural protections. With respect to Count II, Slippery Rock asserts that Ms. Biser cannot establish a "class-of-one" equal protection claim, as she and Ms. Rinehimer were not similarly situated, and, even if they were, a rational basis existed for treating them differently. The Court will address each argument in turn.

### A. Slippery Rock is Entitled to Summary Judgment on Ms. Biser's Procedural Due Process Claim

Ms. Biser argues that Slippery Rock violated her procedural due process rights when it dismissed her from the program because, in her view, the disciplinary hearing process was deficient in several respects. Slippery Rock responds that the undisputed facts show that Ms. Biser received sufficient process to satisfy the Fourteenth Amendment. The Court agrees with Slippery Rock.

#### 1. Legal Standard

The Fourteenth Amendment provides that no state actor shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This provision imposes procedural constraints on state actors before depriving a person of a property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). As relevant here, "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Procedural due process is highly contextual and "calls for such procedural protections as the particular situation demands." *Id.* The parties' briefing discusses what process is due to an incarcerated individual who is wrongly detained, which is not the appropriate standard in this case, which involves a public educational institution taking disciplinary action against a student. *See generally* ECF Nos. 31 & 38 (citing *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989)).

In the academic context, it is well-recognized that "graduate students at public universities have property interests in continuing their education," such that due process protections attach. *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 162 (3d Cir. 2017); *Phat Van Le v. Univ. of Med. & Dentistry of N.J.*, 379 Fed. App'x 171, 174 (3d Cir. 2010). To evaluate whether disciplinary proceedings against a student satisfy the Fourteenth Amendment, the Third Circuit weighs the following factors: "(1) the private interests at stake, (2) the governmental interests at stake, and

(3) the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards." *Palmer by Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989) (citing *Mathews*, 424 U.S. at 335); *Osei v. Temple Univ.*, 518 Fed. App'x 86, 88 (3d Cir. 2013) (applying this standard in the school context); *Phat Van Le*, 379 Fed. App'x at 174–75; *see also Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 247 (E.D. Pa. 2012).

### 2. The Private and Governmental Interests are Each Significant

When considering the first factor—the private interests at stake—it is evident that Ms. Biser has a significant interest in continuing her education. The Supreme Court has recognized that a student faces considerable consequences when "exclu[ded] from the educational process." *Goss v. Lopez*, 419 U.S. 565, 579 (1975).

With respect to the second factor, Slippery Rock's interests are similarly significant. Schools have an interest in taking disciplinary action "without prohibitive costs and in a manner that will contribute to, rather than disrupt, the educational process." *Palmer by Palmer*, 868 F.2d at 95; *see also Simms v. Pa. State Univ.-Altoona*, No. 3:17-cv-201, 2018 WL 1413098, at *7 (W.D. Pa. March 20, 2018). In this circumstance, Slippery Rock also has an additional interest in preserving its relationships with private institutions like Wellington Retreat that offer clinical rotations for their graduate students and, by extension, taking disciplinary action against anyone that may jeopardize this relationship.

### 3. Slippery Rock's Proceedings Were Fair and Reliable

The final factor evaluates the fairness and reliability of the actual process that Slippery Rock provided to Ms. Biser. Disciplinary proceedings against a student need not adhere to a specific format, but the public university must "provide[] sufficient protections to comply with due process." *Phat Van Le*, 379 Fed. App'x at 174. Although deference is generally given to a

public institution's process, *see, e.g.*, *Missouri v. Horowitz*, 435 U.S. 78, 90 (1978), there are certain protections that the Third Circuit recognizes must be provided, namely, (i) notice and (ii) an opportunity for the student to provide her version of events, *see Osei*, 518 Fed. App'x at 89; *see also Furey*, 884 F. Supp. 2d at 246 (for a student facing expulsion, schools must provide, at a minimum, notice and an opportunity to be heard).

Here, the notice Ms. Biser received was more than adequate. With respect to the timing of notice, the Supreme Court has found that "[t]here need be no delay between the time 'notice' is given and the time of the hearing." *Goss*, 419 U.S. at 582. However, depending on the severity of the disciplinary action that a student faces, further notice may be required. *Brian A. ex rel. Arthur A. v. Stroudsburg Area Sch. Dist.*, 141 F. Supp. 2d 502, 509 (M.D. Pa. 2001) (citing *Goss*, 419 U.S. at 576)). Ms. Biser argues that notice on March 2nd for a March 4th hearing was inadequate. Although courts have upheld a few days as sufficient notice for expulsions, *see id.*, such a finding is unnecessary here because it is undisputed that Ms. Biser also received notice on March 6th for a second hearing on March 18th and yet again on March 20th for a March 23rd hearing. Her disciplinary proceedings spanned weeks, and before each hearing, Ms. Biser received prior notice. Taken together, the notice Ms. Biser received was more than sufficient to satisfy due process.

In addition to adequate notice, students facing disciplinary actions must also be "given the opportunity to explain [their] version of the facts." *Goss*, 419 U.S. at 582. It is undisputed that at each of the three hearings, Ms. Biser was provided the opportunity to be heard. The faculty notes describe her testimony at the first disciplinary hearing in depth. Thus, the Court finds that Ms. Biser had an adequate opportunity to be heard. Moreover, Ms. Biser's testimony has remained

consistent throughout the hearings and her deposition, which further reduces the risk that the disciplinary committee wrongfully deprived her of a property interest.

Viewing the undisputed facts as a whole, the Court finds that the procedures Slippery Rock afforded Ms. Biser were fair and reliable. The procedural safeguards were also extensive. Slippery Rock held three disciplinary committee hearings, providing Ms. Biser with advanced notice before each. In addition to notice of the three hearings, she had the opportunity to select an advocate, and selected Professor Kessler, whose role included answering questions, ensuring the disciplinary committee asked appropriate questions, and confirming that Ms. Biser had an opportunity to speak at each hearing. *Id.* ¶¶ 36, 38–41, 45, 47. At each of the three hearings, Ms. Biser did, in fact, speak. *Id.* ¶ 44. To begin the first hearing, Professor Buterbaugh read aloud a statement regarding the circumstances around Ms. Biser's dismissal from Wellington Retreat. ECF No. 33-12. The disciplinary committee then read aloud letters submitted by Wellington Retreat staff explaining why the students were dismissed from the rotation. *Id.* Finally, upon receiving the Student Handbook, Ms. Biser had prior notice that a dismissal from her rotation could result in a dismissal from the graduate program. ECF No. 33-1 at 29. The Student Handbook stated that a student would be dismissed from Slippery Rock if "dismissed from [a] clinical site based upon inappropriate behavior or unprofessional conduct."[2] *Id.* This extensive process, which the Court finds was fair and reliable, also ensured that "the risk of erroneous deprivation is low." *Phat Van Le*, 379 Fed. App'x at 175.

To the extent that Ms. Biser argues that additional procedural safeguards should have been in place, the Court finds that the value of such safeguards, if any, is outweighed by the costs of

---

[2] To the extent that Ms. Biser argues that her dismissal from Wellington Retreat was improper because she was not informed about the guest policy, this argument is not relevant because Wellington Retreat, as a private medical facility, was not obligated to afford her procedural due process in dismissing her from the rotation.

13

requiring Slippery Rock to make its disciplinary procedures more administratively robust. The additional safeguards Ms. Biser seeks include the opportunity to have legal counsel, a witness list, a report on witness testimony, and a formal hearing. In addition, she states that she should have been provided the claims or charges brought against her, the results of the disciplinary committee's findings, and the right to appeal the dismissal. In essence, Ms. Biser requests a formal judicial proceeding, similar to the process litigants are guaranteed in court. As support, Ms. Biser relies on out-of-circuit and state decisions, which are not binding on this Court.

In the Third Circuit, when public universities take steps to dismiss a student, there is no constitutional requirement that the school provide a proceeding that resembles a formal trial—only that the student be provided notice and "the opportunity to characterize [her] conduct and put it in what [s]he deems the proper context." *See Horowitz*, 435 U.S. at 85–86 (1978). In fact, the Third Circuit has recognized that the reliability and fairness of the process would not be significantly improved by "[r]equiring representation by counsel, cross-examination, and other, more formal procedural safeguards," which would only result in added expense and disruption to the educational process. *Palmer by Palmer*, 868 F.2d at 95; *see, e.g.*, *Coulter v. E. Stroudsburg Univ.*, No. CIV.A.3:10CV0877, 2010 WL 1816632, at *3 (M.D. Pa. May 5, 2010) (legal counsel is not required unless a student faces criminal liability). Despite this, Ms. Biser was still provided extensive procedural protections as discussed above.

Therefore, the Court finds that the third factor of the *Eldridge* test favors Slippery Rock, and that additional safeguards are not required to satisfy the Fourteenth Amendment. Accordingly, because the Court finds that she was afforded sufficient procedural due process, summary judgment on Count I will be entered in Slippery Rock's favor.

**B.      Slippery Rock is Entitled to Summary Judgment on Ms. Biser's Equal Protection Claim**

In Count II, Ms. Biser asserts that Slippery Rock violated the Fourteenth Amendment's Equal Protection Clause by treating her differently from Ms. Rinehimer, who unlike Ms. Biser was readmitted to the graduate program. A "class-of-one" equal protection claim like this one requires a plaintiff to establish that "(1) the defendant treated [her] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The parties first dispute whether Ms. Biser and Ms. Rinehimer were similarly situated. In the Third Circuit, individuals are considered "similarly situated under the Equal Protection Clause when they are alike in all relevant aspects." *Mun. Rev. Servs., Inc. v. McBlain*, 347 Fed. App'x 817, 825 (3d Cir. 2009) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)). The students do not need to be "identical in all relevant aspects," but there must be a showing that they are alike, determined only through a fact-intensive and case-by-case inquiry. *Save Our Saltsburg Schs. v. Blairsville-Saltsburg Sch. Dist.*, No. 2:21-cv-601, 2021 WL 2209294, at *4 (W.D. Pa. June 1, 2021) (Stickman, J.) (quoting *Borrell v. Bloomburg Univ.*, 955 F. Supp. 2d 390, 405 (M.D. Pa. 2013)). Here, Slippery Rock argues that Ms. Biser and Ms. Rinehimer were "materially different" because the man brought back to Wellington Retreat was Ms. Biser's guest and not Ms. Rinehimer's, and therefore Ms. Biser's conduct was more culpable. ECF No. 31 at 8–9. Ms. Biser responds that the students are alike in all relevant aspects: both were physician assistant graduate students at Slippery Rock, both were on clinical rotations at Wellington Retreat, both stayed on-site, both decided to bring a man back to Wellington Retreat, and both were dismissed from their

15

rotation.  Taking the facts in the light most favorable to Ms. Biser as the non-moving party, the Court assumes without deciding that Ms. Biser and Ms. Rinehimer were similarly situated.

The parties do not appear to dispute the second prong—whether Slippery Rock intentionally treated Ms. Biser differently than Ms. Rinehimer.  There is no dispute that Slippery Rock did intend to readmit Ms. Rinehimer and not Ms. Biser.

The final prong of Ms. Biser's "class-of-one" equal protection claim requires her to show that there was no rational basis for Slippery Rock to treat the students differently.  *Hill*, 455 F.3d at 239.  When reviewing a rational basis, courts are bound by a "very deferential standard." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018).  A strong presumption of validity attaches to a proffered rational basis when neither a fundamental right nor a suspect classification is at issue.  *Montanye v. Wissahickon Sch. Dist.*, 399 F. Supp. 2d 615, 622 (E.D. Pa. 2005).  Courts will deny an equal protection claim at this lowest level of scrutiny when "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007).

Here, based on the undisputed facts, Slippery Rock has articulated a rational basis for its decision to dismiss Ms. Biser and readmit Ms. Rinehimer to the graduate program.  As its rational basis for readmitting Ms. Rinehimer, Slippery Rock claims that, in the events surrounding their dismissal at Wellington Retreat, Ms. Rinehimer was less culpable than Ms. Biser.  ECF No. 32 ¶ 50. According to Slippery Rock, Ms. Rinehimer testified at the disciplinary committee hearing that the man accompanying them to Wellington Retreat was Ms. Biser's guest, which Slippery Rock later considered when it decided to readmit Ms. Rinehimer.  *Id.* ¶ 51.

Rational basis only requires a plausible reason, which the governmental decisionmaker may have considered to be true and cannot be "so attenuated as to render the distinction arbitrary

or irrational." *Walker*, 473 F.3d at 77 (quoting *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003)). When reviewing the proffered rational basis, courts do not have "a license . . . to judge the wisdom, fairness, or logic" of the decision. *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)).

Slippery Rock's rational basis for the difference in treatment is plausible and is neither arbitrary nor irrational. In explaining the administration's decision to readmit Ms. Rinehimer, Ms. Borger testified that the Slippery Rock administration felt that "it was not [Ms. Rinehimer's] guest that was brought back to the room and, therefore, it was a different scenario." ECF No. 34-3 at 28:12–18. Besides this testimony from Ms. Borger, there is a "reasonably conceivable state of facts" that supports Slippery Rock's position. *Walker*, 473 F.3d at 77. During Ms. Rinehimer's first March 4th hearing, she described to the disciplinary committee what happened that night, and, according to the faculty notes, she testified that it was Ms. Biser's idea to bring the man back to Wellington Retreat that night. Although the parties dispute who actually intended to bring the man back, that dispute is not material to the Court's resolution of this claim. The dispositive question is whether Slippery Rock's reliance on Ms. Rinehimer's testimony constitutes a "reasonably conceivable state of facts" that support Slippery Rock's rational basis for treating the students differently. *Walker*, 473 F.3d at 77. The Court finds that it does. The notes taken by the disciplinary committee provide direct insight into their decisionmaking process. If they believed Ms. Rinehimer's testimony that it was Ms. Biser's decision to bring the man back, rather than Ms. Rinehimer's, this provides an adequate rational basis for treating the students differently.

Because Slippery Rock had a rational basis for treating the students differently, the Court finds that Ms. Biser has failed to establish a "class-of-one" equal protection claim. Accordingly, summary judgment on Count II will be entered in Slippery Rock's favor.

IV. **Conclusion**

For the foregoing reasons, Defendant Slippery Rock's Motion for Summary Judgment will be GRANTED as more fully set forth in the accompanying order. Accordingly, Ms. Biser's claims will be dismissed with prejudice and judgment will be entered in Slippery Rock's favor.

DATED this 31st day of January, 2023.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record